```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
ROBERT KEPHART,                          :    18cv2735(DLC)
                                         :
                    Plaintiff,           :    OPINION AND
              -v-                        :        ORDER
                                         :
CERTAIN UNDERWRITERS AT LLOYD'S OF       :
LONDON SEVERALLY SUBSCRIBING TO POLICY   :
NO. 0015150/17/1,                        :
                                         :
                    Defendant.           :
                                         :
---------------------------------------- X
```

APPEARANCES:

For the Plaintiff:
Verne Alan Pedro
Merlin Law Group
100 Park Avenue 16th Floor
New York, NY 10017

For the Defendant:
Michele A. Lo Presti
The Chartwell Law Offices, LLP
100 SE 2nd Street
Suite 2150
Miami, FL 33131

Marlin Green
Brown Sims PC
4000 Ponce de Leon Blvd.
Ste 630
Coral Gables, FL 33146

DENISE COTE, District Judge:

This litigation arises out of a marine insurance policy (the "Policy") issued to plaintiff Robert Kephart ("Kephart") for a 46-foot boat named the Komedy III (the "Vessel") by the defendant Certain Underwriters at Lloyd's of London

("Underwriters").  Kephart has alleged that Underwriters denied or underpaid coverage for damage sustained by the Vessel on two separate occasions in violation of the terms of the Policy.  Underwriters has moved for summary judgment to dismiss the entirety of Kephart's claims.  Underwriters's motion is granted.

## **Background**

The following facts are undisputed or taken in the light most favorable to the non-moving party unless otherwise noted.

<u>The Marine Insurance Policy</u>

The dispute between the parties concerns the terms of the Policy, originally issued to Kephart for the Vessel in 2011.  As relevant to the dispute at hand, the Policy was effective for a renewal period of May 2, 2017 to May 1, 2018.  The Policy covered loss or damage to the Vessel arising from an enumerated list of incidents, including grounding, and excluded coverage for damage incurred through certain events or conditions.  One coverage exclusion was for damage caused by a "Named Windstorm."  But, this exclusion could be waived if "previously agreed by [Underwriters] in writing with terms and conditions to be decided and only following the submission of a Hurricane Preparedness Plan, agreed by [Underwriters] in an [sic] Policy Endorsement, and then subject also to the conditions of Section 13."

Section 13, in turn, provided a "Named Windstorm Exception" which extended coverage to damage sustained from Named Windstorms, with the additional condition that "[i]t is warranted by you that the Hurricane Preparedness Plan is strictly adhered to and that any changes to it are advised to and agreed in writing." The Certificate of Insurance issued to Kephart for the Vessel, dated May 5, 2017, provided that this "Named Windstorm extension applies." The Policy explained in a definitional section that "if a warranty is breached, the Insurers will be discharged from liability as from the date of breach of the warranty."

Kephart completed a Hurricane Preparedness Plan, dated April 4, 2011 (the "HPP"). The HPP included the following questions and answers supplied by Kephart:

> 6. <u>If your vessel will be afloat</u> between 1st of July and 1st of November please give full details of your plan for protecting the vessel in the event of any storm warning, including intended places of refuge, mooring and/or anchoring arrangements, size of line use, # of fenders, type of pilings and height and how the vessel will be secured . . . .
>
> Immediately go to a known hurricane hole -- if none close by then a river surrounded by mangroves -- double & triple lines using no less than 1" lines -- find a spot with less fetch -- so swells don't break you loose. Double & triple ground gear – plan for extra; water, food & emergency generator -- <u>secure all items from boat that might fly around</u> -- pump out bilges and close all three hulls[;] <u>secure all items inside boat that might come loose</u> and injure someone. Flash lights and medical supplies should be on hand –

> 7. Please supply details of your <u>backup plan</u> (if you are prevented from implementing your initial plan)
>
> If enough time is available <u>make arrangements for a haulout</u> track storms carefully
>
> 8. <u>If laid up ashore</u> from 1st of July and 1st of November <u>will your vessel be supported by props or jack stands chained &/or welded together professionally?</u>
>
> <u>Yes</u>
>
> 9. List <u>all other measures</u> to be taken to protect your vessel in the event of a storm? (e.g. remove and stow loose gear, stow or lash dinghy down, remove and stow canvas and sails, multiple mooring lines, snubbers, etc.)
>
> (<u>see six above</u>).

(Emphasis supplied.)

Just above the signature section of the HPP, in a section titled "Important Read Before Signing," the HPP states:

> It is hereby noted, understood, agreed and warranted in the event of any . . . Named Storm . . . that <u>I/we will make every effort to secure my/our vessel(s) &/or its equipment</u> in a suitable shelter, slip, hurricane hole or mooring in accordance with the representations above and <u>take all reasonable precautions necessary to safeguard the vessel and/or its equipment and accoutrements including</u> but not limited to <u>removing and storage Biminis</u> and dodgers, <u>canvas items, loose upholstery, cushions, roller-furled sails</u>, outriggers and antennas, liferafts, hard tenders or inflatable dinghies.

(Emphasis supplied.)

An application form, completed and signed by Kephart on April 29, 2011, provided, in a section titled "Named Windstorm Cover":

> In the event of a Named Windstorm you must take all
> necessary steps to prevent or minimize loss or damage
> and act as though you were uninsured.

In this same form, Kephart filled out the "details of your severe storm contingency plan," which largely mirror the plans laid out in the HPP. This document also contained a "Declaration" section, immediately preceding Kephart's signature, which stated, <u>inter alia</u>,

> I/We declare that in the event of a Named Windstorm
> the vessel and/or its <u>gear and equipment will be
> secured</u> in accordance with the arrangements specified
> above.
>
> I/We also declare and agree that My/Our absence from
> the area at the time of the passing of the Named
> Windstorm does not absolve Me/Us from responsibility
> to protect and safeguard the vessel.[1]

(Emphasis supplied.)

The Policy contained a choice-of-law provision that provides that, the "Policy shall be governed by, interpreted and construed under United States federal maritime law or, in the absence of any entrenched federal maritime law on the issue in question, under the internal laws of New York without regard to conflict of law principles."

<u>The Grounding Incident</u>

On July 29, 2016, the Vessel was damaged when grounded on coral reef. After this incident, the Vessel was transferred to

---

[1] Underwriters describe this document as part of the HPP.

Robbie's Marina ("Robbie's") in Key West, Florida where it was stored pursuant to a July 29, 2016 agreement between Kephart and Robbie's. The 30(b)(6) deponent for Robbie's testified that the Vessel was stored on "tall metal supports that hold the vessel upright" that were "chained together." Consultants for the Underwriters surveyed the Vessel's damage.

In connection with the July 29 grounding, Underwriters paid Kephart $33,000 on October 4, 2016 and paid $30,000 on December 14 to Key West Boat Repair and Maintenance, which had been engaged to perform repairs on the Vessel. These payments were memorialized in documents titled "Interim Discharge Form," signed by Kephart on September 15 and November 18, 2016, respectively. Following months of correspondence between the parties and an additional inspection of the Vessel, Underwriters paid Kephart an additional $15,000. This payment was memorialized in a document titled "Discharge form" and signed by Kephart on April 19, 2017 (the "Discharge"). The Discharge stated

> Subject to the policy terms and conditions I/we Robert Kephart agree to accept from [Underwriters] payment to be made for the sum of US$ 15,000, which is net of the policy excess, <u>in full and final settlement and discharge all liabilities and monies due under [the Policy]</u> for the incident that occurred on or about the 29th of July.

(Emphasis supplied.)

6

Hurricane Irma

Around September 3, 2017, Kephart left Key West to travel to New Jersey. The Vessel remained stored at Robbie's. On September 10, Hurricane Irma made landfall in Key West. Winds from the storm damaged the Vessel when they blew the Vessel off its blocking. Kephart subsequently filed a notice of claim for this damage and Underwriters conducted inspections of the Vessel. Photographs taken during a September 22, 2017 investigation show the Vessel on its side and off the metal jack stands on which it had rested. On November 24, 2017, Underwriters denied Kephart's insurance claim. In its declination letter, Underwriters explained the claim was being rejected because Kephart had not complied with the HPP and because Kephart "did not take any steps to properly secure [the Vessel] prior to Hurricane Irma."

Kephart testified that when he left Key West he believed the Vessel was being "taken care of by Robbie's" but that he did not have an agreement with Robbie's which stated that Robbie's would be responsible for securing the Vessel. Kephart further testified that he had not arranged for anyone else to secure the Vessel on his behalf in advance of Hurricane Irma. Kephart testified that upon leaving Florida, the canopy was on the Vessel and the sails were still on the Vessel but were "rolled up" and placed "in the mast."

7

Kephart commenced this lawsuit on March 28, 2018. An amended complaint was filed on September 7. The amended complaint alleged breach of contract and breach of the implied covenant of good faith and fair dealing stemming from Underwriters's refusal to adequately compensate Kephart for damage incurred to the Vessel through the July 29, 2016 and September 10, 2017 incidents. Following the conclusion of discovery, Underwriters filed this motion for summary judgment on March 15, 2019.

**Discussion**

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Smith v. Cnty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015).

"[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citation omitted) (emphasis omitted).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

Noncompliance with Local Rule 56.1

Local Rule 56.1 requires a party moving for summary judgment to submit a short and concise statement, in numbered paragraphs, of the material facts as to which that party contends there is no genuine issue to be tried. Local Rule 56.1(a). A party opposing a motion for summary judgment is to respond to each paragraph in "a correspondingly numbered paragraph"; each paragraph is deemed admitted for purposes of this motion if not "specifically controverted by a correspondingly numbered paragraph." Id. at 56.1(b), (c). If necessary, the opposing party shall offer its own statement of additional undisputed material facts. Id. at 56.1(b). The parties' statements, including statements controverting any statement of material fact, must be followed by citation to admissible evidence. Id. at 56.1(d).

"A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001). But, if a court overlooks a failure to comply with Local Rule 56.1, it may not grant summary judgment unless examination of the record "show[s] that . . . the moving party is entitled to judgment as a matter of law." Id. at 74 n.1.

Underwriters did not submit a Local Rule 56.1 Statement. Although Underwriters's failure to comply with Local Rule 56.1 has burdened both the Court and Kephart, the Court declines to deny its motion for summary judgment on this basis. The resolution of this motion relies principally on constructions of the Policy, the HPP, and the Discharge Form and there are few factual disputes.

Insurance Claim Arising from Hurricane Irma

Underwriters moves for summary judgment on Kephart's claims seeking damages for Underwriters's denial of Kephart's insurance claim stemming from Hurricane Irma. Underwriters argues that coverage for the damage to the Vessel caused by Hurricane Irma is precluded by Kephart's breach of the terms of the HPP.

"Absent a specific federal rule, federal courts look to state law for principles governing maritime insurance policies"; "[t]here is no specific federal rule governing construction of maritime insurance contracts." Commercial Union Ins. Co. v. Flagship Marine Servs., Inc., 190 F.3d 26, 30 (2d Cir. 1999). The Policy contains a choice of law provision explaining that "in the absence of any entrenched federal maritime law on the issue in question, under the internal laws of New York without regard to conflict of law principles."

"Under New York law, insurance policies are interpreted according to general rules of contract interpretation." Olin

Corp. v. OneBeacon Am. Ins. Co., 864 F.3d 130, 147 (2d Cir. 2017). "Under New York law, . . . a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties." In re MPM Silicones, 874 F.3d 787, 795 (2d Cir. 2017). If the intent of the parties is clear from the four corners of a contract, its interpretation is a matter of law that the court may determine by summary judgment. Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008)(applying New York law). "The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous." In re MPM Silicones, 874 F.3d at 795.

> [C]ontract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business

Olin Corp., 864 F.3d at 148 (citation omitted). By contrast, a contract is unambiguous if its "language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014) (applying New York law).

> When a provision in an insurance contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract. If the extrinsic evidence fails to establish the parties' intent, courts may apply other

12

rules of contract interpretation, including New York's insurance-specific version of the rule of contra proferentem, according to which ambiguity should be resolved in favor of the insured.

Olin Corp., 864 F.3d at 148.

"If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." Torres v. Walker, 356 F.3d 238, 245 (2d Cir. 2004) (applying New York law). In interpreting contracts, "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted). Additionally, "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted) (applying New York law).

New York law governing "the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds." Beazley Ins. Co., Inc. v. ACE Am. Ins. Co., 880 F.3d 64, 68 (2d Cir. 2018). Such "exclusions are enforced only when they have a definite and precise meaning, unattended by danger of

misconception and concerning which there is no reasonable basis for a difference of opinion." Id. at 68-69 (citation omitted).

The parties agree that the HPP is a warranty. In the maritime insurance context, the Second Circuit has defined a warranty as "a promise by which the assured undertakes that some particular thing shall or shall not be done, or that some condition shall be fulfilled, or whereby he affirms or negatives the existence of a particular state of facts." Commercial Union Ins. Co., 190 F.3d at 31 (citation omitted). New York's Insurance Law defines a "warranty" as:

> any provision of an insurance contract which has the effect of requiring, as a condition precedent of the taking effect of such contract or as a condition precedent of the insurer's liability thereunder, the existence of a fact which tends to diminish, or the non-existence of a fact which tends to increase, the risk of the occurrence of any loss, damage, or injury within the coverage of the contract.

N.Y. Ins. L. § 3106(a).

"Under the federal rule and the law of most states, warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to recover." Commercial Union Ins. Co., 190 F.3d at 31. This rule "stems from the recognition that it is peculiarly difficult for marine insurers to assess their risk, such that insurers must rely on the representations and warranties made by

14

insureds regarding their vessels' condition and usage." Id. at 31-32. New York law also recognizes this rule of strict compliance with warranties in maritime insurance contracts. See N.Y. Ins. L. § 3106(c) ("This section [stating that breach of collateral warranties shall not preclude recovery] shall not affect the express or implied warranties under a contract of marine insurance.").

In addition to their agreement that the HPP is a warranty, the parties agree that the HPP applies to the Hurricane Irma incident and that a breach of the HPP would preclude Kephart's recovery under the Policy for this incident. Underwriters argues that Kephart breached the HPP by failing to secure the Vessel on metal jack stands with chains or by welding them together, and by failing to remove and store Bimini[2] and canvas items, loose upholstery, cushions, sails, antennas, and the mast. Kephart asserts that because hauling the Vessel out of navigable water is an agreed upon alternative contingency plan under the HPP, and where, as here, the Vessel was already "hauled out" and on land prior to a qualified storm event, he complied with the HPP, the HPP is not applicable, or, at a minimum, it is ambiguous. Underwriters is correct that Kephart

---

[2] A bimini is a cover for the cockpit or deck of a boat that is often made of fabric stretched on a metal frame.

15

breached the HPP, precluding coverage for damage sustained during Hurricane Irma.

The terms of the HPP which apply to this incident are unambiguous. The plain language of the HPP required Kephart to secure all items in and on the Vessel. Just above the signature section, the HPP required Kephart to "make every effort to secure [the] vessel[] &/or its equipment" and to take "all reasonable precautions necessary to safeguard the vessel and/or its equipment and accoutrements including . . . removing and stor[ing] Biminis . . . , canvas items, loose upholstery, cushions, [and] roller-furled sails" in the event of impending Named Storm winds. Similarly, Section Nine, which incorporated Section Six, required Kephart to "secure all items from boat that might fly around" and "secure all items inside boat that might come loose" in the event of a storm. While the HPP set forth separate agreed-upon steps to be taken to secure the Vessel itself depending on whether it was "afloat" or "laid up on shore," the HPP required items on the Vessel to be secured in both scenarios.

The uncontradicted evidence in this case demonstrates that Kephart failed to perform these obligations. Kephart admits that he made no arrangements to secure the Vessel in advance of Hurricane Irma. Nor was it reasonable for him to believe that Robbie's would secure the Vessel for him according to the

specific requirements of the HPP when he had not communicated these requirements to it. The photographs taken during the September 2017 investigation show the bimini still on the Vessel and loose items in the Vessel, including certain equipment, which had not been stowed. Kephart also testified that when he left Florida days before Hurricane Irma made landfall, the "canopy" was still on the Vessel and had not been stored in preparation for the storm.[3]

Kephart's sole argument against summary judgment on this issue is that because the Vessel was hauled out of the water at the time of the storm, the HPP is ambiguous as to whether he had any obligation to take further steps to prepare the Vessel for the storm. Section Seven asked for a "backup plan," which Kephart explained would be to arrange for a "haulout" if enough time is "available." Kephart argues that, where the vessel was already ashore when the storm hit, the HPP is ambiguous because the Vessel could not be hauled out when already on dry land. This argument ignores the other obligations contained in the

---

[3] While Underwriters asserts that the photographs taken during the September 2017 investigation of his claim show that the Vessel had not been secured on props or jack stands that had been chained or welded together professionally, as required by Section Eight, Robbie's 30(b)(6) witness testified that the Vessel was secured on metal support stands that were chained together. Whether Kephart complied with Section Eight is a question of disputed fact that may not be resolved at the summary judgment phase.

17

HPP, including that Kephart secure the Vessel's equipment. As such, Kephart's argument that the haul-out provision in Section Seven governs the dispute and creates ambiguity is rejected.

Because Kephart breached the unambiguous terms of the HPP, a warranty that must be strictly complied with under maritime insurance law, he is not entitled to coverage under the Policy for damage incurred on or around September 10, 2017. Underwriters' motion for summary judgment on the claims stemming from denial of insurance coverage for this incident is granted.

Discharge

Underwriters also moves for summary judgment on Kephart's claims that he is entitled to additional recovery under the Policy for the damage the Vessel incurred in the July 29 grounding incident. It relies on the Discharge as precluding Kephart from seeking further recovery on this claim. The plain terms of the Discharge release Underwriters from further liability under the Policy for the July 29 incident.

"[S]tipulations of settlement are judicially favored and may not lightly be set aside. In general, repudiation of an agreement on the ground that it was procured by duress requires a showing of both [1] a wrongful threat and [2] the effect of precluding the exercise of free will." United States v. Twenty Miljam-350 IED Jammers, 669 F.3d 78, 88 (2d Cir. 2011) (citation and emphasis omitted). In addition, because duress renders

18

contracts voidable, rather than void, "the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." Id. at 89 (citation omitted).

Kephart argues that the Discharge is voidable because, based on his financial circumstances -- which Kephart attributes without support to Underwriters's "delay and gamesmanship" -- he had no choice but to accept the terms of the Discharge. Kephart has put forward no evidence that the Discharge is unenforceable or voidable. His bare assertion that he had no choice but to accept the terms of the settlement is insufficient to set aside the Discharge. Underwriters' motion for summary judgment on claims stemming from the July 29 grounding incident is granted.

## Conclusion

The Underwriters's March 15, 2019 motion for summary judgment in the above-captioned case is granted. The Clerk of Court shall enter final judgment for the defendant and close the case.

Dated: New York, New York
July 3, 2019

_____
DENISE COTE
United States District Judge